IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 19, 2002

## STATE OF TENNESSEE v. JAMES ROBERT LAWSON

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S43,617     R. Jerry Beck, Judge**

---

**No. E2001-01415-CCA-R3-CD      Filed July 3, 2002**

---

The Defendant pled guilty to one count of child abuse, a Class D felony. Following a hearing, the trial court denied judicial diversion. The trial court sentenced the Defendant as a Range I, standard offender to two years to be served on intensive probation. The Defendant now appeals, arguing that the trial court erred by denying him judicial diversion and by imposing as a condition of his probation that he not reside in the same household with children of "tender years." Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID H. WELLES, J., joined.

Terry L. Jordan, Blountville, Tennessee, for the Appellant, James Robert Lawson.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and James F. Goodwin, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

## I.  FACTUAL BACKGROUND

The Sullivan County Grand Jury returned a presentment charging the Defendant, James Robert Lawson, with child abuse, a Class D felony. The Defendant moved for pretrial diversion, which was denied by the District Attorney General. The trial court affirmed the prosecutor's denial of pretrial diversion. The Defendant pled guilty to the charged offense and sought judicial diversion. Following a hearing, the trial court denied judicial diversion. The trial court sentenced the Defendant as a Range I, standard offender to two years to be served on intensive probation. As conditions of his probation, the trial court ordered that the Defendant have no contact with the

victim, that he refrain from residing in the same household with children of "tender years," and that he have liberal but supervised visitation with his fourteen-month-old child.

The facts of the underlying case, as presented by the State and as stipulated by the Defendant, are as follows: On November 10, 1999, Detective Darla Anderson of the Kingsport Police Department went to Holston Valley Hospital in response to a child abuse complaint. Anderson observed a five-year-old female with several bruises, including "petechial-type" bruising underneath each eye. There was also bruising to both sides of the child's face with linear-type markings indicative of a hand. Upon questioning, the child told Detective Anderson that her daddy slapped her face. The child also stated that she was knocked down and hit with a belt. Detective Anderson found several bruises on the child's buttocks area that were in different stages of healing. Dr. Goh examined the child at the hospital. The Department of Children's Services then removed the child and placed her in a foster home. Detective Anderson determined that when the child's mother discovered the bruises, the Defendant told the mother that the child had tripped over the cat and busted her nose.

At the hearing on the motion for judicial diversion, Victoria Lawson testified that she had been married to the Defendant a year and a half. Lawson testified that on November 10, 1999, she had been married to the Defendant for two weeks and that he was living with her and her five-and-a-half-year-old daughter, the victim in this case. On that date, she left the Defendant and the victim at home while she went to the grocery store. After about forty-five minutes, Lawson returned home to find the Defendant giving her daughter a bath. Her daughter's face was "red and puffy" and "[t]here was a little bit of blood about one nostril." When Lawson asked the Defendant what had happened, he responded that she had tripped over the cats.

Lawson testified that approximately four or five hours later, the Defendant told her what had really happened. However, before he relayed what had occurred, he stated that he was going to check into Woodbridge Hospital because he was having suicidal thoughts again. The Defendant left their home that evening. Lawson testified that she and the Defendant separated while he was in treatment, but that they had been living together again since January 2001. Lawson stated that the victim was living with Lawson's mother in North Carolina. Lawson testified that the difference in the Defendant since treatment is "like night and day." Lawson stated that the Defendant is more responsible and takes his medication regularly. Lawson maintained that the Defendant is remorseful about his actions.

On cross-examination, Lawson stated that she has a fourteen-month-old daughter living in the home with her and the Defendant. Lawson acknowledged that the Defendant did not admit to her that he hit the victim on the back. Lawson testified that the Defendant told her that "he put his hands behind her back and pushed her across the step . . . and that she fell on the floor."

Michelle Barbara Tizdell testified that she has known the Defendant since 1999. Tizdell has observed the Defendant in her home interacting with her children and with the Defendant's step-daughter. Tizdell testified that the Defendant has been alone with her children who are seven, ten,

and thirteen years old.  Tizdell maintained that she has never had a problem with the Defendant watching her children and that she feels comfortable leaving them with him.  Tizdell stated that she has noticed "a tremendous amount of difference" in the Defendant since his treatment.  She further stated that the Defendant is "more into his family" and is "more responsible."

Frank Lynn Eugene Blender testified that he has known the Defendant since 1992 and that he and the Defendant lived together on "about three or four different occasions."  Blender testified that before the incident, the Defendant was depressed all of the time and that he would "fall into these big depression things" where he did not want to go out or do anything.  Blender stated that since November 1999, the Defendant seems to be getting better.  Blender maintained that the Defendant would be a good candidate for probation and that he would be safe around children.  Blender acknowledged that the Defendant did not tell him all the details of the incident involving the victim.

Dr. Gary Lee Petiprin testified that he has a Ph.D. in counseling psychology and is employed at East Tennessee State University, where the Defendant attended school.  Petiprin testified that he counseled the Defendant for the first time in November 1999.  Petiprin stated that the Defendant told him that he had repeatedly hit his step-daughter in the face with an open hand the day before.  According to Petiprin, the Defendant stated that he hit his step-daughter hard enough to cause her to fall down, have a bloody nose, and later to develop discoloration under her eyes.  As a result of the conversation, Dr. Petiprin, without objection from the Defendant, contacted Child Protective Services.

Dr. Petiprin felt that the Defendant should be hospitalized, and the Defendant agreed.  The Defendant was subsequently admitted to Woodbridge Hospital.  Dr. Petiprin testified that he and the staff believed that the Defendant was depressed.  Dr. Petiprin saw the Defendant during nineteen weekly or bi-weekly sessions between November 1999 and May 2000.  Dr. Petiprin testified that the Defendant was remorseful about his actions and that his moods became more stable with treatment.  In addition, the Defendant informed Dr. Petiprin that he and his wife had been attending a parenting class through a community agency.

The Defendant withdrew as a student from East Tennessee State University, and Dr. Petiprin referred him to a division of Frontier Health.  Dr. Petiprin recommended that the Defendant continue in personal counseling and continue taking his medication.  Dr. Petiprin believes that treatment is the most appropriate course for the Defendant and that the Defendant could eventually be reunited with his step-daughter.

On cross-examination, Dr. Petiprin admitted that the Defendant did not tell him anything about hitting his step-daughter with a belt or about telling his wife that the victim received the injuries from tripping over a cat.  Dr. Petiprin acknowledged that lying is not a sign of remorse.

Dr. David A. Sabatino testified that he is a psychologist specializing in child or adolescent psychology.  Dr. Sabatino testified that the Defendant was one of his patients at East Tennessee

Psychological Associates. Dr. Sabatino stated that the Defendant attended fifteen sessions alone and thereafter attended sessions with his wife. Dr. Sabatino initially diagnosed the Defendant with bi-polar disorder. However, after the Defendant began taking medication, Dr. Sabatino revised that diagnosis to major recurrent depression and later to a [dystemic] disorder which is a low-grade "bothersome depression." Dr. Sabatino testified that the Defendant responded very well to medication. Dr. Sabatino further testified that the Defendant was remorseful about his actions and extremely motivated. Dr. Sabatino stated that the Defendant discontinued treatment in January 2001 after Dr. Sabatino notified him that he had met his treatment goals. Dr. Sabatino maintained that because the Defendant had developed thought organization to promote social control and self-control, it would be a "positive accomplishment" if the Defendant were to be placed back in a family relationship with his wife and his step-daughter. On cross-examination, Dr. Sabatino acknowledged that the Defendant did not tell him that he struck his step-daughter across her back.

## II. ANALYSIS

### A. Judicial Diversion

The Defendant argues that the trial court erred in declining to impose a sentence pursuant to Tennessee Code Annotated § 40-35-313, commonly referred to as judicial diversion. According to this statute, the trial court may, in its discretion, following a determination of guilt, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A). A qualified defendant is one who pleads guilty or is found guilty of a misdemeanor or a Class C, D or E felony; who has not previously been convicted of a felony or a Class A misdemeanor; and who is not seeking deferral for a sexual offense or a Class A or Class B felony. Id. § 40-35-313(a)(1)(B)(I)(a)-(c); State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

When a defendant contends that the trial court committed error in refusing to grant judicial diversion, this Court must determine whether the trial court abused its discretion in failing to sentence pursuant to the statute. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997). Judicial diversion is similar to pretrial diversion; however, judicial diversion follows a determination of guilt, and the decision to grant judicial diversion is initiated by the trial court, not the prosecutor. State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992). When a defendant challenges the trial court's denial of judicial diversion, we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision. Cutshaw, 967 S.W.2d at 344; Parker, 932 S.W.2d at 958. As this Court stated in Anderson,

> [w]e conclude that judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under T.C.A. § 40-15-105. Therefore, upon review, if "any substantial evidence to support the refusal" exists in the record, we will give the trial court the benefit of its discretion. Only an abuse of that discretion will allow us to overturn the trial court.

857 S.W.2d at 572 (citation omitted).

The criteria that the trial court must consider in determining whether a qualified defendant should be granted judicial diversion include the following: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) the deterrence value to the defendant and others. Cutshaw, 967 S.W.2d at 343-44; Parker, 932 S.W.2d at 958. An additional consideration is whether judicial diversion will serve the ends of justice, i.e., the interests of the public as well as the defendant. Cutshaw, 967 S.W.2d at 344; Parker, 932 S.W.2d at 958.

The trial court stated that in denying judicial diversion, it considered the Defendant's educational background and lack of a criminal record as positive factors. The trial court found that the Defendant violated a position of private trust, that he had a mental disorder and that he had admitted using marijuana in the past. The trial court assigned a great deal of weight to the fact that the Defendant violated a position of trust. The trial court found that the Defendant's problems "appear to be associated in that he leads a orderly life" and that if that orderly life is disturbed, "he's likely to go off and potentially harm someone around him." Therefore, the trial court denied judicial diversion.

We conclude that the trial court did not abuse its discretion in denying judicial diversion. After being married to his wife for only two weeks, the Defendant repeatedly struck his five-year-old step-daughter in the face. As a result, the victim sustained large bruises under each eye and a bloody nose. It was also stipulated that Detective Anderson found several bruises on the child's buttocks area that were in different stages of healing. Although the Defendant did seek treatment for his actions, Dr. Peliprin could not say whether the Defendant's anger management improvement was due to being out of the environment or making behavioral changes. As the trial court noted, the Defendant violated a position of private trust. The trial court considered several positive factors, but determined that the Defendant's violation of a position of private trust outweighed the positive factors. The record contains substantial evidence supporting the trial court's decision to deny judicial diversion, and, thus, we conclude that the trial court did not abuse its discretion.

## B. Conditions of Probation

The Defendant also argues that the trial court erred in ordering as a condition of his probation that the Defendant not live in the same household with a small child. In so finding, the trial court acknowledged that such a restriction "creates problems with families," but stated that "the important thing is that we don't have a repetition of having a situation where the Defendant is in the household with children that are vulnerable." The trial court also required that the Defendant be evaluated through Frontier Health, and if a program of treatment and rehabilitation is indicated, that he complete such a program. The trial court ordered that the Defendant have no contact with the victim. The trial court did allow liberal, but supervised visitation with the Defendant's fourteen-month-old daughter. The trial court placed the Defendant on intensive probation subject to special conditions.

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

A trial court may order conditions of probation that are "reasonably related to the purpose of the offender's sentence and not unduly restrictive of the offender's liberty, or incompatible with the offender's freedom of conscience, or otherwise prohibited by this chapter . . . ." Tenn. Code Ann. § 40-35-303(d)(9). Although several witnesses testified that the Defendant's demeanor and attitude had improved with treatment, there is no guarantee that the Defendant would not repeat his behavior. While he was receiving psychological treatment, the Defendant did not live with the victim, and Dr. Petiprin noted that it was difficult to determine whether the Defendant's anger management improvement was due to behavioral changes or simply the fact that he was no longer living with his wife and step-daughter. We agree with the trial court that the safety of the children is of the utmost priority. We note that the trial court allowed for the Defendant to have supervised visitation with his young daughter. Considering the nature of the Defendant's conviction and the evidence presented at the hearing, we conclude that the trial court properly ordered as a condition of his probation that the Defendant not live in a household with young children.

Accordingly, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE

-6-